**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS COURTHOUSE**

| | |
|---|---|
| Sara Feldman, individually and on behalf of all others similarly situated, | 7:22-cv-06089 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Wakefern Food Corp., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.     Wakefern Food Corp. ("Defendant") manufactures, markets, labels, and sells "Graham Crackers" made with sugar, honey and whole grains under the Bowl & Basket brand ("Product").



2.     The relevant front label representations include "Graham Crackers," "Sugar Honey," a honey dipper in a jar of honey, a "stamp" stating "8g or more [whole grains] grain per serving," and "No High Fructose Corn Syrup."

3.     The labeling gives consumers the impression it has a greater absolute and relative amount of whole grain graham flour compared to non-whole grain flour than it does and that it contains a non-de minimis amount of honey.

## I.     CONSUMER DESIRE FOR WHOLE GRAINS

4.     Consumers increasingly prefer whole grains to non-whole, or refined, grains.

5.     Whole grains are nutritionally superior to non-whole grains because they include the entire grain seed, consisting of the endosperm, bran, and germ.

6.     The bran and germ contain important nutrients like fiber, vitamins, minerals, and antioxidants, such as iron, zinc, folate, magnesium, thiamin, niacin, selenium, riboflavin, manganese, copper, vitamin A, and vitamin B6.

7.     In contrast, "non-whole grains" or "refined grains" have been processed to remove the bran and germ, thereby removing the fiber and most other nutrients.

8.     Most refined grains are enriched, a process that adds back some of the previously removed iron and B vitamins, such as thiamin, riboflavin, niacin, and folic acid.

9.     Other nutrients, including fiber, vitamin E, vitamin B6, vitamin K, magnesium, manganese, potassium, phosphorus, copper, calcium, and selenium, are not added back.

10.     Where flour is made of refined grains, which only contains the endosperm and mainly starch, it is white in color ("white flour").

## II.     CONSUMERS EXPECT FIBER WHERE PRODUCT TOUTS WHOLE GRAINS

11.     The 2015-2020 Dietary Guidelines for Americans recommend that at least half of all grains eaten be whole grains.

12.     The Dietary Guidelines recommend consuming 48g of whole grains and 28g of fiber per day.

13.     Research proves that consumers seek whole grains because they want more fiber.

14.     Consumers expect foods represented as whole grain tells them more than they are made with a type of grain ingredient.

15.     87% of consumers try to consume more whole grains and 92% try to get more fiber.

16.     In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

17.     Almost 75% of consumers who are presented representations which contain express and implied representations that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – estimated to be 10% of the daily value.

18.     Almost 70% of consumers agree whole grains are one of the best sources of fiber.

19.     46% of consumers rely on foods with whole grains for their daily fiber needs.

## III.   CONSUMER CONFUSION ABOUT WHOLE GRAINS

20.     Despite consumers' desire to consume more whole grains, a recent study in the journal Public Health Nutrition concluded that deceptive labeling stymies these efforts.

21.     The study found that the most significant information considered by consumers in trying to "make half their grains whole" was the front label.

22.     One food and nutrition professor stated, "Even people with advanced degrees cannot figure out how much whole grain" is in products represented to consumers as whole grain.

23.     Almost half of study participants incorrectly estimated the whole grain content of grain products, and about the same number overstated the whole grain content of actual whole grain foods.

24.     The FDA and FTC have highlighted multiple deceptive tactics companies should avoid to prevent consumers from being misled about a food's whole grain content.

A.  Product Name

25.     A recent study revealed that when product names use terms like "graham," "honey wheat," "stone ground," "harvest," "multigrain" or "wheat," between 30% to 50% of participants believed such foods have more whole grains than products without such names.

26.     The FDA, Federal Trade Commission ("FTC") and the non-profit advocacy group the Center for the Science in Public Interest ("CSPI") have warned companies against such misleading whole grain representations, through product names including "HiHo Deluxe WHOLE WHEAT Crackers," "Krispy WHOLE WHEAT Saltine Crackers," and names which incorporate specific whole grain flours.

27.     The FDA has stated that "Graham flour is an alternative name for whole wheat flour (§ 137.200)," which is subject to a "standard of identity."

28.     The Product's name, "Graham Crackers," incorporates the name of a whole grain flour, which causes consumers to expect it is predominantly whole grain.

29.     Dictionaries confirm these commonly held beliefs when it comes to a "graham cracker," defining it as "a slightly sweet cracker made of whole wheat flour" and "a semisweet cracker, usually rectangular in shape, made chiefly of whole-wheat flour."[1]

30.     However, the ingredient list reveals the refined grain ingredient of "Enriched Flour"

[1] https://www.dictionary.com/browse/graham-cracker

is the predominant flour, listed ahead of "Graham Flour (Whole Wheat Flour)."

> **INGREDIENTS:** <mark>ENRICHED FLOUR</mark> (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMIN MONONITRATE, RIBOFLAVIN, FOLIC ACID), <mark>GRAHAM FLOUR</mark> (<mark>WHOLE WHEAT FLOUR</mark>), SUGAR, HIGH OLEIC CANOLA AND/OR SOYBEAN OIL WITH TBHQ AND CITRIC ACID FOR FRESHNESS, HONEY, CONTAINS 2% OR LESS OF: LEAVENING (BAKING SODA, CALCIUM PHOSPHATE), SALT, NATURAL FLAVOR, SOY LECITHIN, SODIUM SULFITE.

B.  <u>Citing Amount of Whole Grains on Front Label</u>

31.   Extensive research by the FDA and FTC shows that when consumers are presented with labeling that highlights whole grains, they will expect those foods to get at least half of its grain content from whole grain.

32.   Further, most consumers will expect any direct or indirect references to whole grains to mean a food's grain content is 100% or entirely whole grain.

33.   This includes statements such as "Made With Whole Grains" and references to how many grams of whole grains are present.

34.   The Product's front label contains a small stamp which states, "Whole Grain – 8g or more per serving."



35.    However, this representation is misleading because it does not tell consumers that the Product is predominantly non-whole grain flour.

36.    Consumers have no way to determine the proportion of whole grain graham flour to refined white flour based on this disclosure.

37.    Consumers are unable to know what percent of the weight of the serving size of the Product is attributable to grain content compared to the Product's other ingredients.

38.    The small print below the stamp references the 48g of whole grains people should consume daily.

39.    Without knowing how many grams of refined grain are in the Product, consumers cannot determine whether half their grains are whole, which is what the Dietary Guidelines recommend.

40.    The result is consumers will unknowingly consume more of the Product to get more whole grains, even though they will end up consuming excess refined grains.

41.    Consumption of substantially more refined grains than whole grains is inconsistent with dietary guidelines to make half your grains whole.

42.    Studies have shown that where foods make multiple claims and statements about their whole grain content, consumers will expect it to provide at least 10% of the Reference Daily Intake ("RDI") or the Daily Reference Value ("DRV") of fiber.

43.    However, the Nutrition Facts reveal the Product is not a good source of fiber as it provides only 1g or 5% of the DRV.

C.    Darker Colors Cause Consumers to Expect Greater Amount of Whole Grains

44.    According to a food economist and professor at Tufts University, manufacturers have many ways to persuade consumers about a product's whole grain content.

45.     Studies have shown that consumers seeking whole grains look for products darker in color with visible grains.

46.     This is due to the presence of bran in whole grains, which gives it a distinctive brown coloring, as opposed to refined grains, which contains only the endosperm, which is white.

47.     A recent study participant stated, "For me I like to look at the color" to find out if a food is mainly whole grain.

48.     Companies sometimes add ingredients to foods made mainly from refined grains to cause it to have a darker color so consumers will expect more whole grains.

49.     Though the Product contains honey purportedly for a sweetening effect, the most significant function of honey is to impart a darker color to the crackers.

50.     According to scholar W.K. Nip, the presence of "mostly reducing sugars in [honey's] sugar profile" causes it "[to] brown[s] easily during baking, adding a natural dark color to baked products such as bread, crackers, and other products."[2]

51.     The Product's color would be significantly lighter if based solely on the ratio of refined grains to whole grains.

52.     The small amount of honey contributes to consumers getting the misleading impression the Product contains more whole grain graham flour than it does.

53.     To the extent the Product has a "honey" taste, this is due to the added "Natural Flavor."

54.     The front label fails to disclose the addition of added natural flavor which resembles and contributes to the Product's characterizing honey taste.

---

[2] W.K. Nip et al., eds. *Bakery products: science and technology*, Ch. 7, "Sweeteners," John Wiley & Sons, 2006.

7

55.     This is required by identical federal and state regulations for flavoring disclosure. 21 C.F.R. § 101.22(i).

## IV.   CONCLUSION

56.     Defendant makes other representations and omissions with respect to the Product which are false and misleading.

57.     Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

58.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

59.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

60.     Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

61.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $3.29 for 14.4 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

62.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

63.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

64.     Plaintiff Sara Feldman is a citizen of New York.

65.     Defendant Wakefern Food Corp. is a New Jersey corporation with a principal place of business in Keasbey, Middlesex County, New Jersey.

66.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

67.     The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in hundreds of locations across the States covered by Plaintiff's proposed classes.

68.     The Product is available to consumers from Defendant's retail stores, like ShopRite, and online.

69.     Assignment and venue are in the White Plains Courthouse in this District because a substantial part of the events or omissions giving rise to these claims occurred in Westchester County, including Plaintiff's purchase, consumption, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

<u>Parties</u>

70.     Plaintiff Sara Feldman is a citizen of Yonkers, Westchester County, New York.

71.     Defendant Wakefern Food Corp. is a New Jersey corporation with a principal place of business in Keasbey, New Jersey, Middlesex County.

72.     Wakefern is America's largest retailer-owned cooperative grocery store.

73.     Wakefern is in the top 20 in sales among all supermarkets in the nation.

74.     It is comprised of 50 companies who operate 362 supermarkets across New Jersey, New York, Connecticut, Pennsylvania, Delaware, Maryland, Massachusetts, New Hampshire, and Rhode Island.

75.   Wakefern's store banners include ShopRite, Fairway Market, The Fresh Grocer, Price Rite Marketplace, Dearborn Market, and Gourmet Garage.

76.   Wakefern has been known for its values and unique approach to business and community, through its ethics, transparency to investors and customers, and philanthropy.

77.   While Wakefern stores like ShopRite sell leading national brands, they sell a large number of products under their private label Bowl & Basket brand.

78.   Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

79.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

80.   Bowl & Basket brand products have an industry-wide reputation for quality and value.

81.   In releasing products under the Bowl & Basket brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

82.   Defendant is able to get national brands to produce private label items under the Bowl & Basket brand due its loyal customer base and tough negotiating.

83.   That Bowl & Basket products continually meet this high bar is proven by focus groups, which rated them above the name brand equivalent.

84.   Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

85.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60% consider them to be just as good."

86.     Private label products under the Bowl & Basket brand benefit by their association with consumers' appreciation for Wakefern's store banner brands, like ShopRite, as a whole.

87.     The development of private label items is a growth area for Wakefern, as they select only top suppliers to develop and produce Bowl & Basket products.

88.     Plaintiff purchased the Product at locations including ShopRite, 25-43 Prospect St, Yonkers, NY 10701, between December 2021 and February 2022, among other times.

89.     Plaintiff believed, expected, and desired that the Product had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did because that is what the representations and omissions said and implied, on the front label and/or the absence of any references or statements elsewhere on the Product.

90.     Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging and/or images on the Product, on the labeling, statements, omissions, claims and, statements, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

91.     Plaintiff bought the Product at or exceeding the above-referenced price.

92.     Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

93.     Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

94.     The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

95.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar graham crackers, because she is unsure whether those representations are truthful.

Class Allegations

96.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of New Jersey, Pennsylvania, New Hampshire, Delaware and Connecticut who purchased the Product during the statutes of limitations for each cause of action alleged.

97.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

98.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

99.   Plaintiff is an adequate representative because her interests do not conflict with other members.

100.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

101.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

102.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

New York General Business Law §§ 349 and 350

(Consumer Protection Statute)

103.   Plaintiff incorporates by reference all preceding paragraphs.

104.   Plaintiff believed the Product had a greater absolute and/or relative amount of whole

grain graham flour compared to non-whole grain flour than it did.

105. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

106. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

107. Plaintiff relied on the representations and omissions to believe the Product had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did.

108. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

109. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

110. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

111. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

112. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages by paying more for the Product than they would have paid, had they known the truth.

113.   Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose</u>
<u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

114.   The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did.

115.   Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

116.   Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

117.   Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did.

118.   Defendant's representations affirmed and promised that the Product had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did.

119.   Defendant described the Product so Plaintiff believed it had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did, which became part of the basis of the bargain that it would conform to its affirmations and promises.

120.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

121.   This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company, known for its transparent labeling, and its commitment to putting customers first.

122.   Plaintiff recently became aware of Defendant's breach of the Product's warranties.

123.   Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

124.   Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

125.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

126.   The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

127.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did.

128.   The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

129.  Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

130.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it had a greater absolute and/or relative amount of whole grain graham flour compared to non-whole grain flour than it did.

131.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

132.  Defendant knew of the issues described here yet did not address them.

133.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

134.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Awarding monetary damages, restitution and disgorgement, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   July 18, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com